13-2025-cv(L)
Ermini v. Vittori

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

August Term, 2013

(Argued:  April 9, 2014                    Decided:  July 8, 2014)

Docket Nos. 13-2025-cv(L), 13-2199 (XAP)

---

EMILIANO ERMINI

*Petitioner-Appellant-Cross-Appellee,*

– v. –

VIVIANA VITTORI

*Respondent-Appellee-Cross-Appellant.*[1]

---

[1]     The Clerk of Court is directed to amend the caption in this case to conform to the listing of the parties above.

1

Before: CALABRESI, CABRANES, and LIVINGSTON, *Circuit Judges*.

Emiliano Ermini, an Italian citizen, petitioned the district court (Swain, *Judge*) pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10494 (Mar. 26, 1986) (the "Hague Convention" or the "Convention"), as implemented in the United States by the International Child Abduction Remedies Act, 42 U.S.C. § 11601-10, seeking the return of his two sons to Italy, from their mother Viviana Vittori, in the United States. The district court held that return would pose a "grave risk" of harm, pursuant to Article 13(b) of the Convention, to one of the sons, who has severe autism, and that separating the siblings would pose a grave risk of harm to both of them. It therefore denied appellant's petition as to both children. Confronting various issues of first impression in this Circuit, we affirm the district court's decision to deny the petition. We also amend the judgment to deny the petition with prejudice.

> ROCCO LAMURA, Tosolini Lamura Rasile & Toniutti LLP, New York, New York, *for Petitioner-Appellant-Cross-Appellee.*

2

SANKET J. BULSARA (Jacob Press, Tamar Kaplan-Marans, Maria Banda, Jing-Li Yu, Musetta Durkee, *on the brief*), Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York, *for Respondent-Appellee-Cross-Appellant*.

Gary S. Mayerson, Tracey S. Walsh, Maria C. McGinley, Mayerson & Associates, New York, New York, *for Amicus Curiae* Autism Speaks.

Jeremy T. Adler, Davis Polk & Wardwell LLP, New York, New York, *for Amicus Curiae* Travis Thompson, Ph.D. and Paolo Moderato, Ph.D.

Anthony S. Barkow, Elizabeth A. Edmondson, Eddie A. Jauregui, Jenner & Block LLP, New York, New York, *for Amicus Curiae* Jacqueline Sands.

Gregory J. Wallance, W. Stewart Wallace, Susanna Y. Chu, Kaye Scholer LLP, New York, New York, *for Amicus Curiae* Professor Elizabeth Lightfoot, Sanctuary for Families, and Child Justice, Inc.

Robert H. Smit, Simpson Thacher & Bartlett LLP, New York, New York, *for Amicus Curiae* Domestic Violence Legal Empowerment and Appeals Project, The Family Violence Appellate Project, and Professors Shani M. King and Lisa V. Martin.

3

CALABRESI, *Circuit Judge*:

This case presents us with novel, and significant, issues under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10494 (Mar. 26, 1986) (the "Hague Convention" or the "Convention"), as implemented in the United States by the International Child Abduction Remedies Act, 42 U.S.C. § 11601-10. While the Convention is designed, in part, to ensure the prompt return of children wrongfully removed or retained from their country of habitual residence by one parent, it also protects children who, though so removed or retained, face a real and grave risk of harm upon return. Here, we are confronted with forms of psychological and physical harm arising from separating a child from autism therapy. The question of whether the risk of such harms is sufficiently grave to trigger the Convention's exceptions has not been previously considered by our Court. We today hold that such risk can be sufficiently grave, and, on the facts found by the district court, that in this case it is. For this reason, and another, we affirm the district court's denial of the appellant's petition.

We also face, as a matter of first impression, the district court's decision to deny the petition without prejudice to renewal. We hold that this was error, and amend the judgment to deny the petition with prejudice.[2]

## I.

Emiliano Ermini and Viviana Vittori are Italian citizens. They began living together in Italy in 2001, and were married in 2011. The couple had two children: Emanuele, who is 10, and Daniele, who is 9. Daniele is autistic. In the midst of a custody dispute, Ermini petitioned the district court pursuant to the Hague Convention, a multilateral treaty to which the United States and Italy are signatories, seeking the return to Italy of his two sons, who were then, and today remain, in the United States.

---

[2]     Several motions are pending before the Court. Vittori moves for the Court to take judicial notice of documentation regarding changes in her, and her children's, immigration status. Ermini moves for the Court to take judicial notice of a foreign court decision from Velletri, Italy, dated April 23, 2013. Pursuant to Federal Rule of Evidence, sections 201(b)(2), (c)(2), and (d), we grant both motions. In addition, several parties, all listed above as amicus curiae, had moved for leave to file their briefs. Pursuant to Federal Rule of Appellate Procedure 29(b), we grant their motions, and hence have listed them above.

Ermini filed his petition in August of 2012, and the district court conducted a bench trial in January of 2013. Under Federal Rule of Civil Procedure 52(a), on April 19, 2013, the district court produced an opinion, which contained its findings of fact and conclusions of law, and issued its judgment. *Ermini v. Vittori*, No. 12 Civ. 6100, 2013 WL 1703590 (S.D.N.Y. Apr. 19, 2013).

## A.

The district court found several facts that are relevant to the matter before us. First, the court found that the family had moved to the United States in August of 2011 in connection with its longstanding efforts to find appropriate treatment for Daniele. *Id.* at *4. Daniele had been diagnosed with autism in March of 2008, and the couple sought unsuccessfully to find adequate Applied Behavioral Analysis ("ABA") therapy for Daniele in Italy.[3] *Id.* at *2. Indeed, while there, Vittori herself provided the bulk of Daniele's therapy. *Id.*

---

[3]     ABA is an "intensive one-on-one therapy that involves breaking down activities into discrete tasks and rewarding a child's accomplishments." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 176 (2d Cir. 2012) (internal quotation marks omitted). ABA instructors use "careful behavioral observation and positive reinforcement or prompting

6

Dissatisfied with Daniele's development, the family sought other avenues of relief. *Id.* In Spring of 2010, in Italy, they met Dr. Giuseppina Feingold, an Italian-speaking doctor with a practice in Suffern, New York. *Id.* at *3. In August of 2010, they traveled to New York so that Dr. Feingold could more fully assess and begin treating Daniele. *Id.* The parents were impressed with the treatment options presented by Dr. Feingold, and began to plan a move to Suffern, at first for a period of two-three years, but with the potential of a permanent relocation in mind, depending on the success of Daniele's treatment. *Id.*

Things moved speedily thereafter. The family returned to New York in August of 2011, and promptly signed a one-year lease on a house. *Id.* at *4. The children were enrolled in public schools, and Daniele's therapy began soon after. *Id.* at *8-9. The parents put their home in Italy on the market, prepared to open a business in the United States, and made arrangements to send their belongings here. *Id.* at *4.

---

to teach each step of a[n appropriate] behavior." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 226 n. 5 (2d Cir. 2012) (internal quotation marks omitted).

In the meantime, Ermini, who had remained employed in Italy, traveled back and forth between the United States and Italy. *Id.* During a December of 2011 return to America, an apparently already contentious relationship between Ermini and Vittori came to a head when a "violent altercation" occurred, with Ermini physically abusing Vittori in the kitchen of their Suffern, New York home. *Id.* at *5. In its findings of fact, the district court found credible testimony that during this altercation Ermini had, among other acts, hit Vittori's head against a kitchen cabinet, and attempted to "suffocate" and "strangle" her. *Id.*

The district court determined this incident was part of a history of physical violence by Ermini. *Id.* The court found that Ermini "expresses anger verbally and physically," had hit Vittori at least ten times during the course of their relationship, and was "in the habit of striking the children." *Id.*

In response to the December of 2011 incident, Vittori obtained a temporary order of protection from the Suffern Court of Justice for herself and the children. The order, among other things, granted her temporary custody of the children through May 9, 2012. *Id.* at *6.

8

Ermini returned to Italy and instituted divorce proceedings. *Id.*

Vittori went back to Italy for those proceedings in April of 2012, by which

time the children's American visas had expired. *Id.*

Meanwhile, in July of 2012, Ermini resolved criminal charges that

had been brought against him as a result of the December of 2011 domestic

abuse incident by pleading guilty in New York State court to harassment

in the second degree. *Id.* at *7. As a part of that plea, he consented to a one-

year order of protection, which, among other things, required him to

refrain from contacting the children. *Id.*

In September of 2012, Ermini petitioned an Italian court in Velletri

for an order directing Vittori to return with the children to Italy. *Id.* The

court in Velletri granted Ermini's petition, ordering Vittori to return with

the children, and making various rulings granting shared parental

authority between Ermini and Vittori and assigning visitation rights. *Id.*

In April of 2013, however, the Court of Appeals in Rome issued an

order (the "Rome Order") vacating several provisions of the Velletri

court's order. *Id.* The Court of Appeals granted Vittori exclusive custody of

the children, did not require her to return to Italy with the children, and

9

explicitly fashioned its order to comport with the orders of protection issued in the United States arising from the December of 2011 domestic abuse incident. *Id.*

With this background in mind, the district court made several further findings of fact about the children and their experiences. Emanuele, who had testified before the court *in camera*, was found to have displayed "candor" and "maturity," as well as a strong command of the English language. *Id.* at *8. He was happy in America, and preferred living here, both because of the "fear" he had of his father and because he preferred the schooling he was receiving here. *Id.*

Moreover, the district court found that Daniele had "significantly progressed" with his therapy in the United States. *Id.* He was engaged in a Comprehensive Application of Behavioral Analysis to Schooling ("CABAS") program in Stony Point, New York, which, according to Vittori's expert, Dr. Carole Fiorile, offered the best ABA curriculum then available to autistic children. *Id.* at *9. The program involved one-on-one instruction with an educational team, including a special educational

10

teacher, an occupational therapist, a speech and language therapist, several classroom assistants, and a full-time one-on-one teaching assistant. *Id.*

The district court noted that Dr. Fiorile had stated that Daniele required such a program to continue to make meaningful progress in, among other things, cognition, language, and social and emotional skills. *Id.* Dr. Fiorile had also testified that while the United States has over 4,000 board certified ABA practitioners, there were, to her knowledge, fewer than twenty in Italy. *Id.*

The district court, weighing Dr. Fiorile's opinion about the CABAS program, made the following additional factual findings:

> [Daniele] has benefitted immensely from the superior resources of the school program in which he has been enrolled while residing in the United States. The CABAS program, with its structured, intensive curriculum and extensive classroom support, provided by professionals, has resulted in marked improvement of [Daniele's] self-care, communication, vocabulary in English and Italian and his general cognition . . . . The unrebutted testimony of Dr. Fiorile at trial and her expert report support the conclusion that "any hope for [Daniele] to lead an independent and productive life rests in his participation in an intensive behavioral program that rigorously implements the principles and strategies of Applied Behavior Analysis (ABA),

11

such as the school program he currently attends on a daily basis." The hard work and good intentions of [the parents] are not sufficient to enable [Daniele] to progress to the extent to which he is capable. Moreover, there was no evidence presented at trial that any comparable program is even available to [Daniele] in Italy. Accordingly, separating [Daniele] from the CABAS program . . . would put him in an intolerable situation due to the grave risk of deterioration of his condition and denial of needed rehabilitation.

*Id.* at *9 (internal citation and brackets omitted).

Finally, the district court found that Daniele and Emanuele have a close, loving relationship, and that the children and Vittori had overstayed their visas and had applications for renewal pending.[4] *Id.* at *10.

B.

Based on these factual findings, the district court drew several conclusions of law. First, in order to determine if the children were indeed removed from their habitual residence, and therefore whether the Hague Convention applied, the district court considered whether their habitual residence was Italy or the United States. *Id.* at *11-12. The court found that

---

[4]     Although it ultimately does not affect our conclusions, we take judicial notice of the fact that Vittori and the children now have nonimmigrant status as U-Visa eligible noncitizens. *See* footnote 1.

12

the children's habitual residence was Italy, since there was no shared, settled intent among the parents to change permanently the children's habitual residence to the United States. *Id.* at *12. The court also concluded that the children had not sufficiently acclimatized to the United States as to make the United States their habitual residence regardless of the parents' shared intent. *Id.* at *12-13.

The district court next considered whether Vittori had wrongfully retained the children in the United States. *Id.* at *13-15. Taking judicial notice of the law of Italy, pursuant to Article 14 of the Convention,[5] the court explained that custody rights were defined by "mutual agreement" and that the parents had not mutually agreed to keep the children in the United States beyond April of 2012. *Id.* at *14. The court also determined that Ermini had not evinced any intent to abandon the children or to relinquish his custody rights. *Id.* Furthermore, the court found that while the Rome Order held that Vittori had custody and needed not return the children to Italy, the Rome Order was temporary and prospective. *Id.* at

---

[5] The Convention authorizes the district court to "take notice directly of the law of, and of judicial or administrative decisions" of the country of habitual residence. Hague Convention, art. 14.

13

*15. The court therefore found that Vittori had violated Ermini's custody rights during the period between September of 2012, when the Velletri court issued its ruling, and April of 2013, when the Rome Order was issued. *Id.*

As a threshold matter, the district court therefore held that Ermini had proved by a preponderance of the evidence: (1) that the children were habitual residents of Italy, and were being retained in the United States by Vittori; (2) that the retention was in breach of Ermini's custody rights under the law of Italy; and (3) that Ermini was exercising those rights at the time of the children's retention in the United States. *Id.* at *12-15.

The district court explained that the burden then shifted back to Vittori to assert affirmative defenses against the return of the children to the country of habitual residence. *Id.* at *15. On one of these defenses, the court ruled in Vittori's favor. Vittori had argued that return to Italy posed a "grave risk" of harm to Daniele, pursuant to Hague Convention, Article 13(b), which precludes repatriation of a child where there "is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Id.* at *15.

14

Vittori needed to prove this defense by clear and convincing evidence, a burden which the district court held that Vittori had met. *Id.* The record, according to the district court, established that, because Daniele is severely autistic, he would face a grave risk of harm if he had to return to Italy, as the return would "severely disrupt and impair his development." *Id.* at *16. The court further concluded that Daniele would face "significant regression" if his CABAS program was interrupted and held that "the predicted deterioration in [Daniele 's] cognition, social skills and self-care if [Daniele] is separated from the CABAS program . . . constitutes psychological and physical harm sufficient to establish the 'grave risk of harm' affirmative defense." *Id.* The court also determined that because Emanuele and Daniele had a loving and close relationship, separation would be harmful to both siblings, and that avoiding such a separation met the requirements of the Hague Convention. *Id.* at *17.

Accordingly, the court denied Ermini's petition for return to Italy as to both children, but did so "without prejudice to renewal if [Daniele] is no longer able to participate in the CABAS program and the Italian court system issues a final order requiring the return of the children to Italy." *Id.*

15

## C.

Ermini appeals the district court's decision, arguing that the court's conclusion that Daniele faced a "grave risk" of harm under Article 13(b) if separated from his therapy and returned to his habitual residence in Italy was erroneous. Vittori contends, to the contrary, that the district court's decision to deny the petition should be affirmed on this ground and others. She also cross-appeals, claiming, among other things, that the district court wrongly determined: (a) that the children's habitual residence was Italy; (b) that she had breached Ermini's custody rights; and (c) that the domestic abuse suffered by her and the children did not constitute a grave risk of harm under the Convention. Vittori further maintains that the petition should have been denied *with* prejudice to renewal.

In considering the parties' arguments, we review *de novo* the district court's interpretation of the Hague Convention. *Blondin v. Dubois (Blondin IV)*, 238 F.3d 153, 158 (2d Cir. 2001). The district court's factual findings are reviewed for clear error, while its application of the Convention to its factual findings is reviewed *de novo*. *Id.*

16

## II.

The Hague Convention is a pact among nation-states to protect children in limited, though important, circumstances. It establishes uniform standards, on one side, for ensuring the swift return of children wrongfully removed or retained from their home states, and, on the other, for barring return to a home state when doing so would create a grave risk of harm to the children or violate their fundamental human rights and freedoms. *See* Hague Convention, arts. 13 & 20.

The Convention was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, pmbl., 51 Fed. Reg. at 10498. The Convention is not designed to adjudicate custody claims, but only to determine the merits of claims of wrongful removal and abduction. *See id.,* art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

The district court had authority to adjudicate the matter in the instant case, *see id.* arts. 8, 11 & 29, and had to focus, as initially, on whether the children were wrongfully removed or retained, an issue on which Ermini bore the burden of proof by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(1)(A).

Under the Convention, removal or retention of a child is deemed "wrongful" when:

> [1] it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> [2] at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3.

Wrongful removal or retention, however, does not end the matter. If a parent establishes that the removal or retention was wrongful, the child is to be returned unless the defendant establishes one of four defenses. *See Blondin v. Dubois (Blondin II)*, 189 F.3d 240, 245 (2d Cir. 1999); *see also* 42

18

U.S.C. § 11601(a)(4). These defenses, or as they are also called, "exceptions," are to be construed narrowly. *See* 42 U.S.C. § 11601(a)(4).

Two of the four exceptions are to be established by clear and convincing evidence. *See id.* § 11603(e)(2)(A). The first applies if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). The second governs when the return of the child "would not be permitted by the fundamental principles . . . relating to the protection of human rights and fundamental freedoms." *Id.*, art. 20. The remaining exceptions are to be established by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(2)(B). The first exception subject to this lesser standard applies if judicial proceedings were not commenced within one year of the child's abduction and the child is well-settled in the new environment. Hague Convention, art. 12. The second applies if the plaintiff was not actually exercising custody rights at the time of the removal. *Id.*, art. 13(a).

Finally, it should be noted that, since the Convention is a pact among nation-states, Congress has emphasized "the need for uniform

international interpretation of the Convention." 42 U.S.C. § 11601(b)(3)(B).

In light of this necessity, the Supreme Court has made clear that, in

interpreting the Convention, we are to give the opinions of our sister

signatories "considerable weight." *Air France v. Saks*, 470 U.S. 392, 404,

(1985) (quoting *Benjamins v. British European Airways*, 572 F.2d 913, 919 (2d

Cir. 1978)) (internal quotation marks omitted).

## A.

The Hague Convention does not concern itself with situations where

two parents commit to settle a family in a new location, and where in so

migrating, neither parent breaches the other's custody rights. Familial

migration across borders is a facet of family life for many, and unless there

is wrongful removal or retention of children from their habitual residence

and breach of custody rights, the Hague Convention is neither concerned

nor involved. The district court found, however, that both wrongful

retention and breach of custody rights had occurred here, thereby

triggering the Convention's applicability. While we accept the district

court's factual findings on these matters, the legal issues that apply to

these factual findings are quite complicated. Accordingly, we pause at the

20

outset to note that we harbor serious doubts as to the district court's

conclusions of law on these issues. And we deem it appropriate to spend

some time on specifying the applicable legal standards.

i.

The district court found that the children's habitual residence was

Italy, since the parents' last shared intention was to move the family to the

United States *only* for a period of two-three years, and potentially to stay

permanently if Daniele's therapy was successful. *Ermini*, 2013 WL 1703590,

at *11-12. There is, to be sure, some basis for the district court's decision.

We have before stated that, in determining habitual residence, courts are to

focus on whether a "child's presence at a given location is intended to be

temporary, rather than permanent." *Gitter v. Gitter*, 396 F.3d 124, 132 (2d

Cir. 2005). And the two-three year trial period here may well have

influenced the district court's conclusion that *this* move was temporary.

We have also earlier credited a district court's finding that a habitual

residence did not change because a move was of a "trial nature" and

"conditional." *Id.* at 135. And here, the district court, again with reason,

focused on the fact that the parents were to reassess their stay in the

United States at the end of what appeared to be a trial period. *Ermini*, 2013 WL 1703590, at *11-12.

But we stress that the period of time of a move is not the only relevant factor in the analysis. Indeed, our sister signatories have clarified that a habitual residence may be established *even when* a move is for a "limited period" and indeed "indefinit[e]." *Shah v. Barnet London Borough Council and other appeals*, [1983] 1 All E.R. 226, 235 (Eng.H.L). Drawing on the approach in *Shah*, the Ninth Circuit has placed emphasis on divining not just the duration of the move but instead, more broadly, the shared intent and "settled purpose" of the parents. *Mozes v. Mozes*, 239 F.3d 1067, 1074 (2001). As the Third Circuit has stated, when similarly confronted with a two-year relocation, "the fact that the agreed-upon stay was of a limited duration in no way hinders the finding of a change in habitual residence. Rather, . . . the parties' settled purpose in moving may be for a limited period of time. . . ." *Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004); *see also Gitter*, 396 F.3d at 132 (adopting the "shared intent" approach). We thus want to emphasize that the time period attached to a

22

move is but one factor in determining, in a fact-intensive manner, what the settled intent among the parents was in making the move.[6]

Accordingly, we believe that the issue at hand was, at the very least, a closer call than it was framed as being by the district court. In this case, the family's move, though indefinite, was not "of a trial nature" or for a "trial period" as in *Gitter*, nor was akin to a summer sojourn; the move indeed evinces a good degree of "settled purpose" and continuity. 396 F.3d at 132, 135. As the district court found, Ermini and Vittori leased a house in the United States and put their house in Italy on the market; enrolled the children in school and extracurricular activities in the United States; planned to open a business in the United States; prepared to move all of their belongings to the United States; and shifted Daniele's all-important medical care and treatment to the United States. *Ermini*, 2013 WL 1703590, at *3-4. This was a move shared in the parents' minds not only as one of

---

[6]     Along these lines, we also note our skepticism of the district court's conclusion that Ermini conditioned the family's relocation to the United States on his continued cohabitation with Vittori and the children, *see Ermini*, 2013 WL 1703590, at *11-12, particularly in light of Ermini's statements that the move was spurred by the desire to secure improved treatment for Daniele, *id.* at *3. Nevertheless, because we do not rely on the habitual residence inquiry to affirm the district court's ruling, we need not determine whether this factual finding was made in error.

23

duration, stretching into years, but also formed with an understanding that the duration could become permanent if Daniele's treatment was succeeding. *Id.* at *4. The facts found by the district court establish, at a minimum, that the family intended to shift the locus of their family life to the United States for a span of years. And, given these circumstances, we are left uncomfortable with the district court's conclusion that the family's habitual residence did not change.

ii.

Nor, as we see it, is it clear that Vittori breached Ermini's custody rights. Rights of custody are "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a). Custody rights are provided by "the law of the State in which the child was habitually resident immediately before the removal or retention." *Id.*, art. 3(a). The district court determined, quite properly, that, under Italian law, custody rights are defined by "mutual agreement" of the parents, and therefore focused on Ermini and Vittori's agreement. *Ermini*, 2013 WL 1703590, at *14; *see also* Title IV, Italian Civil Code of Law, Art. 316 ("A child is subject to the

24

authority of its parents until majority . . . or emancipation. The authority is exercised by both parents by mutual agreement . . . .").

We have serious doubts, though, as to the court's reading of the Rome Order. *See* Joint App'x at 700-710. The Rome Order stated that moving children to the United States had been jointly decided by the parents. *Id.* at 702. Furthermore, the Rome Court of Appeals determined that, under the circumstances, Ermini alone could not decide to remove the children *from* the United States. *Id.* The Rome Court, in reversing the lower court's order, declined to order the children to return to Italy, and awarded custody to Vittori. *Id.* at 703. It therefore appears to us that the Rome Order, which focused in part on the New York proceedings against Ermini for domestic abuse, meant, to the contrary of the Velletri court, that Vittori had *at no time* breached Ermini's custody rights by keeping the children in the United States.[7] This holding inevitably casts doubt on the

---

[7] The Rome Order stated in pertinent part:

> Another element of fact which is before the Court concerns the protection order to safeguard Vittori and her children issued in the United States against Ermini, ending in February 2014. The existence of such a restrictive measure, *at least until it is no longer in effect, precludes shared custody of the children*, with custody having to go to the mother, who is the only one of the

25

district court's conclusion that Vittori violated those rights between the time of the Velletri judgment and the time of the Rome Order.[8]  However, because other grounds exist to affirm the district court's denial of Ermini's petition, we need not address whether we may properly rely on the Rome Order, which was subject to appeal. *See Shealy v. Shealy*, 295 F.3d 1117, 1122 (10th Cir. 2002) (relying on an interim order that was in force at the time a petition was filed to determine custody rights).

---

two parents able to take care of them and to make decisions affecting them.

Joint App'x at 703 (emphasis added). The language indicated that, under Italian law, the New York protection order precluded shared custody whenever it was in effect, including the period following the Velletri judgment.

[8]      Ermini directs our attention to a more recent order of the Velletri court refusing to reissue Italian passports to Daniele and Emanuele, of which we have taken judicial notice. *See* footnote 1. The order was issued a few days after the district court below issued its decision, and we do not take into account the order's skepticism as to Daniele's autism therapy in the United States. Under the Hague Convention, it was the district court that was authorized to make factual and legal determinations about whether removal from the therapy would likely cause physical or psychological harm to Daniele. *See Blondin II*, 189 F.3d at 245 (outlining how the parent who claims the child has been wrongfully removed or retained can make a claim before a district court "of the country to which the children have been taken" to determine whether removal or retention was wrongful).

### iii.

As noted above, the legal issues surrounding custody rights, and defining the family's habitual residence, are complicated. As a result, while we have doubts about the district court's conclusions and thought it important to clarify the governing legal standards, we choose not to ground our decision on those issues. The case can be resolved, and the district court's decision readily affirmed, because we believe—*even assuming arguendo* that the children's habitual residence was in Italy and that Vittori breached Ermini's custody rights—that return would be barred because the children faced a "grave risk" of harm if returned. It is to this issue that we now turn.

### B.

On the assumption that Vittori wrongfully removed and retained the children, the analysis under the Convention would, nonetheless, not be finished. As we noted earlier, the Hague Convention establishes defenses to return, and we hold the "grave risk" of harm defense to be determinative in this case.

i.

The district court found that the risk of harm Daniele faced if removed from his therapy and returned to Italy was grave enough to meet the Hague Convention's standards. We agree. We, however, also hold, contrary to the district court, that Ermini's history of domestic violence towards Vittori and the children was itself sufficient to establish the Hague Convention's "grave risk" of harm defense.

We have in the past ruled that a "grave risk" of harm does not exist when repatriation "might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences." *Blondin IV*, 238 F.3d at 162. But we have also stressed that a grave risk of harm exists when repatriation would make the child "face[] a real risk of being hurt, physically or psychologically." *Id.* The potential harm "must be severe," and there must be a "probability that the harm will materialize*." Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013).

Domestic violence can satisfy the defense when the respondent shows by clear and convincing evidence a "sustained pattern of physical abuse and/or a propensity for violent abuse." *Id.* at 104 (internal quotation

28

marks omitted). And we concluded that a "grave risk" of harm from abuse had been established where the "petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question." *Id.* at 105. Spousal violence, in certain circumstances, can also establish a grave risk of harm to the child, particularly when it occurs in the presence of the child. *See id.* at 103-04 (stating that spousal abuse is relevant insofar as it "seriously endangers the child"); *see also Khan v. Fatima*, 680 F.3d 781, 787 (7th Cir. 2012). We have also been careful to note that "[s]poradic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." *Id.* at 104.

The district court found that Ermini "expresse[d] anger verbally and physically," and that he struck Vittori and frequently hit the children. *Ermini*, 2013 WL 1703590, at *5. Indeed, the district court determined that Ermini was "in the habit of striking the children." *Id.* The district court construed some of the hitting as disciplinary, *id.*, but it did not, and could not, conclude that the hitting was "[s]poradic or isolated." *See Sourgatar*, 720 F.3d at 104. The court also found that Vittori testified credibly that

29

Ermini "had hit her at least 10 times during the course of their relationship." *Ermini*, 2013 WL 1703590, at *5. On the question of abuse, the district court's findings about the "violent altercation" in the kitchen of their Suffern residence on December 28, 2011 are particularly troubling. *Id.* The court credited both Vittori's account of having her head "shoved" into the kitchen cabinets while Ermini attempted to "suffocate" and "strangle" her, and Emanuele's parallel account of the events, which both he and Daniele observed. *Id.* The district court also credited Emanuele's testimony that he generally feared his father. *Id.* at *8.[9]

We believe that these findings by the district court manifestly establish that Ermini engaged in a "sustained pattern of physical abuse," *Souratgar*, 720 F.3d at 104 (internal quotation marks omitted), directed at Vittori and the children: Vittori was repeatedly struck; as were the children, whom Ermini was "in the habit" of hitting; and Emanuele testified to being fearful of his father on the basis of this physical and

---

[9]     We additionally note the potential for a heightened adverse impact of the hitting of the children, and of exposure to the abuse that Vittori suffered, on Daniele as an autistic child. *See* Amicus Br. of Professor Elizabeth Lightfoot *et al.*, 8-13.

30

verbal abuse. These findings evince a "propensity" for violence and physical abuse and a resulting fear in the children. *Id.* at 104. We therefore hold that the facts found by the district court were sufficient to meet the Hague Convention's requirement, by clear and convincing evidence, that the children faced a "grave risk" of harm because of Ermini's physical abuse.[10]

ii.

The district court found that another "grave risk" of harm existed. The court held that Daniele faced a grave risk of harm if removed from his current therapy and returned to Italy. *Ermini*, 2013 WL 1703590, at *16-17. In light of its factual findings,[11] we hold that the district court's conclusion of law was correct.

---

[10] Normally, this finding alone would not end our analysis. We would next consider, or remand for the district court to consider, the range of remedies that might allow for return of the children to their home country *together with* protection from the domestic abuse. *See Blondin II*, 189 F.3d at 248-49. But, since we also hold that there is a second, independent harm to returning the children, which cannot be ameliorated, such further analysis is not needed here.

[11] We note that the opinions and testimony credited by the district court, both about the lack of autism therapy and resources in Italy, and about the harms likely to befall Daniele were he removed from his current program, are sweeping and strong. Whether we, in the district court's

The district court credited the testimony and report of Dr. Fiorile that, if Daniele were to be removed from his educational program and not provided promptly with an analogous program, he would face a severe loss of the skills that he had successfully developed since beginning his program—including his ability to develop cognitive, linguistic, social, and emotional skills. *Id.* at *16, 8-9. The court further credited Dr. Fiorile's conclusion that any "hope for [Daniele] to lead an independent and productive life" depended on his participation in a program such as the CABAS program that he attended on a daily basis, and that this particular program was not available in Italy. *Id.* at *9. Dr. Fiorile also stated that if Daniele were to be removed from this program, he would "cease to be able

shoes, would have adopted these factual findings is irrelevant. The standard of review is "clear error" and our "review under the 'clearly erroneous' standard is significantly deferential." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 623 (1993). We must accept the trial court's findings unless we have a "definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks omitted). In light of Dr. Fiorile's "unrebutted testimony" that Daniele's hope for "an independent and productive life" rested on his continued participation in the CABAS program, as well as the fact that "no evidence" was presented at trial to support that such a program was available to Daniele in Italy, *see Ermini*, 2013 WL 1703590 at *9, we do not.

32

to learn to write or to talk and w[ould] most likely never learn to read."

Joint App'x at 320.

This is the first occasion for this Court to consider this kind of psychological harm pursuant to Article 13(b). We note, however, that Article 13(b) explicitly lists "psychological" harm and "physical" harm as appropriate harms for triggering the Convention's affirmative defenses, both of which are implicated by a developmental disorder such as autism. And we hold that the facts as found by the district court lend themselves straightforwardly to the conclusion that the risk of harm was grave.

First, the district court's findings established there was a "probability that the harm w[ould] materialize." *Souratgar*, 720 F.3d at 103. Indeed, the district court credited testimony that does not speak in terms of probability but instead of near certainty: "if [Daniele] leaves the Stony Point CABAS program even temporarily, he *will* face a significant regression in his skills and [] without such an intensive, structured program, [Daniele] *will not* develop the cognitive, language, social, emotional and independent living skills that he is likely to acquire through such a program." *Ermini*, 2013 WL 1703590, at *16 (emphasis added).

33

Second, the court's finding that Daniele would lose the ability to develop cognitive, emotional, and relational skills, and potentially lead an independent life, if removed from his current therapy and repatriated, establishes harm of a "severe" magnitude manifestly sufficient to satisfy the exception. *Souratgar*, 720 F.3d at 103. The harm, in fact, is of such a severity that it threatens to strike to the very core of the child's development individually and of his ability to participate as a member of society.

We also note that, in similar circumstances, our sister signatories have found the risk of harm in removing an autistic child to be sufficiently grave. *See, e.g., J.M.H. v. A.S.*, [2010] 367 N.B.R. 2d 200 (N.B. Fam. Ct.) (Can.) (concluding that the risk to the wellbeing of a child who exhibited signs of autism in removing the child from treatment was sufficiently grave); *DP Commonwealth Cent. Auth.*, [2001] HCA 39 (High Ct. Austl.) (finding that a lack of adequate treatment facilities for a child with autism in his country of habitual residence was a reason for refusing to return the child).

Considering the unrebutted testimony before the district court concerning the risk of harm Daniele faced if he were returned to Italy, we have no reason to disturb its factual findings. On the basis of those findings, we agree with the district court that the very real harms that Daniele likely would have faced if removed from his therapy and repatriated satisfy the "grave risk" of harm defense.

Moreover, in light of the children's close relationship to each other, and, significantly, the conclusion we reached with respect to abuse, we determine as well that it was not error for the district court to decline to separate the children. *See Ermini*, 2013 WL 1703590, at *17 ("Courts in this Circuit have frequently declined to separate siblings, finding that the sibling relationship should be protected even if only one of the children can properly raise an affirmative defense under the Hague Convention.").

## C.

A final issue confronts us. The district court denied Ermini's petition without prejudice to renewal "if [Daniele] is not able to continue with his current CABAS program and the Italian court system issues a final order requiring the return of the children to Italy." *Ermini*, 2013 WL 1703590, at

*17. We amend the judgment to deny Ermini's petition *with* prejudice to renewal, as we believe the district court's approach—which is, so far as we can tell, the first such instance of denial without prejudice in a Hague Convention case—to constitute an error of law, neither justified nor allowed by the Convention. Since the "proper interpretation of the Hague Convention is an issue of law," we review the district court's decision *de novo*. *Blondin IV*, 238 F.3d at 158 (internal quotation marks omitted).

"In interpreting a treaty, it is well established that we begin with the text of the treaty and the context in which the written words are used." *Swarna v. Al–Awadi*, 622 F.3d 123, 132 (2d Cir. 2010) (internal quotation marks and alteration omitted). The Hague Convention provides either for the "return of the child forthwith" if the child is wrongfully removed, pursuant to Article 12, or for a "determin[ation] that the child is not to be returned," pursuant to Article 16. The Convention authorizes these decisions alone, and stresses the importance of deciding matters "expeditiously." *See* Hague Convention., art. 11. It also explicitly keeps courts out of deciding, or acting under the Convention, "on the merits of rights of custody." *Id.*, art. 16.

36

Furthermore, as the Hague Convention's *Explanatory Report*—which we have construed as being an authoritative and official history of the Convention proceedings, *see Blondin II*, 189 F.3d at 246 n.5—has explained, the Convention "is not concerned with establishing the person to whom custody of the child will belong at some point in the future, nor with the situations in which it may prove necessary to modify a decision . . . on the basis of facts which have subsequently changed." Elisa Perez-Vera, *Explanatory Report: Hague Conference on Private International Law, in* 3 Acts and Documents of the Fourteenth Session 426 (1980), ("Explanatory Report") ¶ 71.

By denying the petition without prejudice to renewal, the district court allows the parties to call upon future events and engage in prospective modifications in light of changed facts in precisely the way the Convention intended to prohibit. As the Explanatory Report shows, the Convention is concerned with events at a particular moment: it either requires return or, in light of the risks of harm or other circumstances, it does not. Once a determination properly applying the Convention to the facts at hand has been made, all other issues leave the realm of the treaty's

domain. The Convention is not, and cannot be, a treaty to enforce future foreign custody orders, nor to predict future harms or their dissipation. *See, e.g., Redmond v. Redmond*, 724 F.3d 729, 741 (7th Cir. 2013) ("The Hague Convention targets international child abduction; it is not a jurisdiction-allocation or full-faith-and-credit treaty. It does not provide a remedy for the recognition and enforcement of foreign custody orders or procedures for vindicating a wronged parent's custody rights more generally."); *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012) ("[T]he Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings."). Indeed, the Convention stresses the need for, and importance of, establishing swiftly a degree of certainty and finality for children. [12] *See, e.g., Chafin v. Chafin*, 133 S. Ct. 1017, 1030 (2013) (Ginsburg, *J.*, concurring) ("Protraction . . . is hardly consonant with the Convention's objectives."); *Blondin II*, 189 F.3d at 244 n.1 (noting the necessity that procedural and substantive decision-making be expeditious

---

[12] Of course, should there be a future Italian custody order, neither parent would be without redress, but that redress would likely come in New York State court, pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act, N.Y. Domestic Relations Law §§ 75 *et seq*.

so they do not exceed the time that the child can endure the uncertainty of the process).

For these reasons, we conclude that the Convention did not permit denial of the petition without prejudice. Accordingly, we order that the judgment be amended to deny Ermini's petition with prejudice to renewal.

## CONCLUSION

We AFFIRM the district court's denial of appellant's petition, and AMEND its judgment to deny that petition with prejudice.