Souratgar v. Fair

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2012

(Argued: March 13, 2013    Decided: June 13, 2013)

Docket No. 12-5088

------------------------------------x

ABDOLLAH NAGHASH SOURATGAR,

    Petitioner-Appellee,

-- v. --

LEE JEN FAIR,

    Respondent-Appellant.

------------------------------------x

B e f o r e :   WALKER, WESLEY and DRONEY, Circuit Judges.

After Lee Jen Fair removed her child from Singapore to New York State in violation of a Singapore court order, Abdollah Naghash Souratgar, the child's father and Lee's husband, filed a petition under the Hague Convention on the Civil Aspects of International Child Abduction for repatriation of the child to Singapore.  The United States District Court for the Southern District of New York (Castel, J.) granted the petition.  AFFIRMED.

ROBERT D. ARENSTEIN, Law Offices of Robert D. Arenstein, New York, NY for Petitioner-Appellee.

RANDY M. MASTRO and Jane Kim, Gibson, Dunn & Crutcher LLP, New York, NY and Dorchen A. Leidholdt, Center for Battered Women's Legal Services, Sanctuary for Families, New York, NY for Respondent-Appellant.

JENNIFER BAUM, St. Vincent de Paul Legal Program, Inc., Child Advocacy Clinic, St. John's University School of Law, Jamaica, NY (Jenna M. DiCostanzo and Jennifer R. Kwapisz, St. John's University School of Law on the brief) for Amicus Curiae Guardian ad Litem.

William C. Silverman, Greenberg Traurig, LLP, New York, NY for Amici Curiae Tahirih Justice Center, Asian Pacific American Legal Center, Ayuda, Battered Women's Justice Project, The Central American Resource Center, Greater Boston Legal Services, Immigration & Asylum Clinic of Boston College Law School, Immigration Justice Clinic, John Jay Legal Services, Inc., Inmotion, Inc., Kentucky Coalition for Immigrant and Refugee Rights, Legal Services NYC, National Immigrant Women's Advocacy Project, New York Asian Women's Center, Inc., Philadelphia Legal Assistance, Sexuality & Gender Law Clinic, and Columbia Law School.

Joel Kurtzberg, Mary McCann, and Etienne Barg-Townsend, Cahill Gordon & Reindel LLP, New York, NY and Lynn Hecht Schafran and Elizabeth Grayer, Legal Momentum, New York, NY for Amici Curiae Legal Momentum, Domestic Violence Legal Empowerment Appeals Project, End Violence Against Women International, Iowa Coalition Against Sexual Assault, National Coalition Against Domestic Violence, National Network To End Domestic Violence, New Mexico Coalition of Sexual Assault Programs, Inc., the Pennsylvania Coalition Against Rape, and the Victim Rights Law Center.

Michael R. Lazerwitz, Lewis J. Liman and Kiesha Minyard, Cleary Gottlieb Steen & Hamilton LLP, New York, NY (William F. Gorin, Abigail Fee and Shira A. Kaufman, Cleary Gottlieb Steen & Hamilton LLP, on the brief) for Amici Curiae Dean Jeffrey L. Edleson, Ph.D., Professor Evan Stark, Ph.D., Professor Michelle Madden Dempsey, Ph.D., Dr. Stephanie Brandt, The Child Advocacy Clinic at Columbia Law School, The University of Baltimore Family Law Clinic, and the University of Oregon Domestic Violence Clinic.

JOHN M. WALKER, JR., Circuit Judge:

Lee Jen Fair appeals the grant of a petition brought by her husband Abdollah Naghash Souratgar for repatriation of their son from New York to Singapore. In May 2012, Lee removed the boy to Dutchess County, New York, in direct violation of a Singapore court order. The United States District Court for the Southern District of New York (Castel, Judge) granted Souratgar's petition pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, and its implementing statute, the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601-10. Souratgar v. Lee Jen Fair, No. 12 CV 7797 (PKC), 2012 WL 6700214 (S.D.N.Y. Dec. 26, 2012).

The principal issue on appeal is whether Lee's affirmative defenses to repatriation should have prevailed in the district court. We find the district court correctly applied the Convention and affirm its order of repatriation.

**I.    Background**

The boy at the center of this case, now four-year-old Shayan, was born in Singapore in January 2009 to Lee and Souratgar, who are both residents of that country. Souratgar is an Iranian national who has owned a business in Singapore since 1989. Lee is a Malaysian national who worked as an airline attendant, saleswoman, and retail manager in Singapore. She converted to Islam, Souratgar's faith, just prior to their marriage in Singapore in 2007. Shayan is a citizen of Malaysia with Malaysian and Iranian passports.

The parties' marital relationship has been stormy. At the district court hearing, they traded accusations and denials of domestic abuse. Souratgar accused Lee, among other things, of biting him, repeatedly threatening him with a knife and chopper, having suicidal tendencies, and inflicting injuries on herself. Lee asserted in her testimony more serious allegations – that Souratgar repeatedly slapped, beat, shook, and kicked her, and that he forced her to perform sex acts against her will. The district court carefully checked these assertions against the various police reports, medical records, and legal papers entered into evidence

4

and, while it could not verify the most severe claims of abuse and found both parties' testimony to be incredible in certain instances, it did credit the accounts it could corroborate.[1]  The district court found spousal abuse by Souratgar, including "shouting and offensive name-calling," and several incidents of physical abuse in which he "kicked, slapped, grabbed, and hit" Lee.[2]  Souratgar, 2012 WL 6700214, at *11.

The district court found no credible evidence of any harm directed against the child.  Both parties, despite their acrimonious contest over his custody, acknowledge the other's love for Shayan, and it is not disputed that the boy dearly loves both of his parents.

---

[1]  The district court's findings as to the charges and counter-charges of domestic abuse by the parties are set forth in the district court's opinion. See Souratgar, 2012 WL 6700214, at *7-10, *11, *12 & *13.

[2]  The district court declined to credit Lee's charge that Souratgar compelled her to engage in certain sexual acts, noting that text messages she sent him indicated her willing participation.  The text messages, however, were sent well before the acts had allegedly occurred, and it is of course possible for express or implied consent to sex to be withdrawn after it is given.  Even if the text messages were sent close to (or even after) the alleged acts, that would not in itself indicate that Lee was a "willing participant" or ipso facto invalidate her testimony that she was forced to engage in sexual activity.  The district court was entitled to make its own determination regarding the credibility of Lee's testimony, and nothing in the record indicates that its finding was erroneous.  Any suggestion that a woman who indicates enthusiasm for a sexual relationship cannot later be taken advantage of in the context of that relationship, however, is mistaken, and we disclaim any indication that our holding today is based on Lee's text messages.  Our concerns on this point do not affect our judgment that, viewed in their entirety, the district court's credibility assessments should not be disturbed.

5

The district court also found Souratgar and Lee to be intelligent, sophisticated individuals who were able to make use of legal proceedings in Singapore, Malaysia, and the United States. In April 2011, when Shayan was two, Lee filed an ex parte application in the Singapore High Court for sole custody. She cited concern that Souratgar would take Shayan from the country and cut her off from the boy. On May 16, the Subordinate Court of Singapore issued an ex parte order directing Souratgar to hand over Shayan's passports and personal documents to Lee and barring Souratgar from removing the child from Singapore without court approval and Lee's knowledge or consent. Souratgar complied with the order, denied Lee's charges, and cross-applied for sole custody. While the custody proceedings were pending in Singapore, Lee moved out of the marital home with Shayan and refused to disclose their whereabouts to Souratgar. He eventually found them in Malaysia, where Lee denied him access to the boy. Souratgar then filed a custody application in the Syariah Court of Malaysia, which granted joint custody to the couple in early July. Thereafter, Lee succeeded in obtaining a dismissal of that order from the Malaysian Syariah Court for lack of jurisdiction.

After Lee and Shayan returned to Singapore, the custody proceedings in Singapore's Subordinate Court resumed. Following a mediation session on July 14, 2011, the Subordinate Court barred either parent from removing Shayan from Singapore without the

other's consent and ordered interim supervised visitation for Souratgar of two hours per week at Singapore's Centre for Family Harmony.  Following another mediation session on February 16, 2012, both parties agreed to a consent order by the Subordinate Court to have custody decided by the Syariah Court of Singapore.[3]  In the meantime, Shayan remained in Lee's care, while Souratgar's visitation time was doubled.

On May 20, 2012, Lee removed Shayan from Singapore, in violation of the Singapore Subordinate Court's order.  Souratgar, through a private investigator, eventually located Lee and Shayan in Dutchess County, and on October 18, filed an ex parte application in the district court under the Convention for Shayan's return to Singapore.

After ex parte hearings, the district court ordered Souratgar to surrender his passport and post bond, and transferred custody of the child to Souratgar.  The district court then appointed a guardian ad litem to represent Shayan's interests and ordered Souratgar to make the child available to Lee for five sessions of visitation per week, with not less than three hours per session, during the pendency of the proceedings.  The district court heard testimony from nine witnesses over a nine-day evidentiary hearing, and on December 26, granted Souratgar's petition.  This petition

---

[3]    In late 2011, Lee had filed for divorce in Singapore's Syariah Court and used that proceeding to dismiss the temporary joint custody order of the Malaysian Syariah Court.

was temporarily stayed pending emergency appeal.  We stayed enforcement of the repatriation order, imposed an expedited briefing schedule, and granted leave for the filing of amicus briefs.

**II.  Discussion**

**A.  The Framework of the Hague Convention**

The Hague Convention, a multilateral treaty, is designed to "protect children internationally from the harmful effects of their wrongful removal [by] establish[ing] procedures to ensure their prompt return to the State of their habitual residence," Abbott v. Abbott, 130 S. Ct. 1983, 2002 n.6 (2010) (quotation marks and emphasis omitted), so that the "rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States," Chafin v. Chafin, 133 S. Ct. 1017, 1021 (2013) (quotation marks omitted).  The Convention's remedy of repatriation is designed to "preserve the status quo" in the child's country of habitual residence and "deter parents from crossing international boundaries in search of a more sympathetic court."  Blondin v. Dubois (Blondin II), 189 F.3d 240, 246 (2d Cir. 1999) (quotation marks omitted).

The removal of a child under the Convention is deemed "wrongful" when "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal."  Abbott, 130 S.

8

Ct. at 1989 (quotation marks omitted).  Under the Convention, when a parent wrongfully removes a child from one contracting state which is the child's country of habitual residence to another contracting state, the other parent may initiate a proceeding to repatriate the child to the first state.[4]  In the United States, the petitioning party bears the burden of proving that the child was wrongfully removed.  42 U.S.C. § 11603(e)(1)(A).  Once the petitioner "establishes that removal was wrongful, the child *must be returned* unless the [respondent] can establish one of four defenses."  Blondin II, 189 F.3d at 245 (quotation marks omitted); see also 42 U.S.C. § 11601(a)(4).  The decision concerning repatriation shall "not be taken to be a determination on the merits of any custody issue."  Blondin II, 189 F.3d at 245 (quotation marks omitted); Mota v. Castillo, 692 F.3d 108, 112 (2d Cir. 2012) ("[T]he Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings.").

The parties do not dispute either that Singapore is the country of Shayan's habitual residence or that his removal from

---

[4]    The United States signed the Convention in 1981 and ratified the treaty, thereby becoming a contracting state, in 1988.  See Ozaltin v. Ozaltin, 708 F.3d 355, 358 n.4 (2d Cir. 2013).  Under Article 38, one state's accession will have effect with respect to another contracting state only after such other state has declared its acceptance of the accession.  1343 U.N.T.S. at 104.  Singapore signed the Convention in 2010 and ratified it on March 1, 2011.  Singapore's accession was accepted by the United States on February 9, 2012 and entered into force on May 1, about three weeks before Lee left Singapore with Shayan.

Singapore was wrongful under the Convention.  The issue on appeal is whether the two affirmative defenses that Lee raised under Articles 13(b) and 20 of the Convention preclude repatriation. Under Article 13(b),

> the judicial or administrative authority of the requested State is not bound to order the return of the child if [the party opposing repatriation] establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

1343 U.N.T.S. at 101.  Under Article 20, repatriation also "may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."  Id.

The respondent parent opposing the return of the child has the burden of establishing "by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies."  42 U.S.C. § 11603(e)(2)(A).  Subsidiary facts may be proven by a preponderance of the evidence.  See In re Lozano, 809 F. Supp. 2d 197, 224 (S.D.N.Y. 2011).  The district court is vested with considerable discretion under the Convention.  Indeed, "even where the grounds for one of these 'narrow' exceptions have been established, the district court is not necessarily bound to allow the child to remain with the abducting parent."  Blondin II, 189 F.3d at 246 n.4.

10

### B.   Standard of Review

We review the district court's interpretation of the Convention de novo and its factual determinations for clear error. Blondin v. Dubois (Blondin IV), 238 F.3d 153, 158 (2d Cir. 2001). Our "review under the 'clearly erroneous' standard is significantly deferential." Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 623 (1993). We must accept the trial court's findings unless we have a "definite and firm conviction that a mistake has been committed." Id. (quotation marks omitted).

### C.   Lee's Article 13(b) defense

Lee contends that returning Shayan to Singapore would expose him to "a grave risk" of "physical or psychological harm" or "otherwise place him in an intolerable situation" and that the district court's finding to the contrary was error. The harms he could face upon return, she asserts, are (1) exposure to spousal abuse; (2) direct abuse from his father; or (3) the loss of his mother. After carefully reviewing the record, we find that Lee's arguments are permeated with conjecture and speculation and that there was no error in the district court's determination that Lee had failed to meet her burden to establish the Article 13(b) defense.

Under Article 13(b), a grave risk of harm from repatriation arises in two situations: "(1) where returning the child means

11

sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, *for whatever reason*, may be incapable or unwilling to give the child adequate protection." Blondin IV, 238 F.3d at 162 (quotation marks omitted). The potential harm to the child must be severe, and the "[t]he level of risk and danger required to trigger this exception has consistently been held to be very high." Norden-Powers v. Beveridge, 125 F. Supp. 2d 634, 640 (E.D.N.Y. 2000) (citing cases). The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize. Van de Sande v. Van de Sande, 431 F.3d 567, 570 (7th Cir. 2005).

This "'grave risk' exception is to be interpreted narrowly, lest it swallow the rule." Simcox v. Simcox, 511 F.3d 594, 604 (6th Cir. 2007); Blondin II, 189 F.3d at 246 (warning that permissive invocation of the affirmative defenses "would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration" (quotation marks and citation omitted)).

### 1. Risk from exposure to spousal abuse

Many cases for relief under the Convention arise from a backdrop of domestic strife. Spousal abuse, however, is only relevant under Article 13(b) if it seriously endangers the child. The Article 13(b) inquiry is not whether repatriation would place

12

the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm. Charalambous v. Charalambous, 627 F.3d 462, 468 (1st Cir. 2010) (per curiam).

The exception to repatriation has been found where the petitioner showed a "sustained pattern of physical abuse and/or a propensity for violent abuse" that presented an intolerably grave risk to the child. Laguna v. Avila, No. 07-CV-5136 (ENV), 2008 WL 1986253, at *8 (E.D.N.Y. May 7, 2008). Evidence of "[p]rior spousal abuse, though not directed at the child, can support the grave risk of harm defense," Rial v. Rijo, No. 1:10-cv-01578-RJH, 2010 WL 1643995, at *2 (S.D.N.Y. Apr. 23, 2010), as could a showing of the child's exposure to such abuse, Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 408 (E.D.N.Y. 2005). Evidence of this kind, however, is not dispositive in these fact-intensive cases.

Sporadic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk. See In re Filipczak, 838 F. Supp. 2d 174, 180 (S.D.N.Y. 2011) (granting repatriation petition even though the child had witnessed one incident of spousal abuse as a two-year-old); Rial, 2010 WL 1643995 at *2-3 (ordering return of child despite evidence that petitioner was verbally and sometimes physically abusive to respondent); Lachhman v. Lachhman, No. 08-CV-

13

04363 (CPS), 2008 WL 5054198, at *9 (E.D.N.Y. Nov. 21, 2008) (concluding that evidence of petitioner's previous arrest, but not conviction, on domestic abuse charges was insufficient to establish grave risk where there was no evidence that petitioner had ever harmed child). In this case, the district court found that, while Lee was subjected to domestic abuse on certain occasions – albeit less than she claimed, at no time was Shayan harmed or targeted.

We have held that Article 13(b) relief could be granted if repatriation posed a grave risk of causing unavoidable psychological harm to the child. See Blondin IV, 238 F.3d at 160-61 (affirming denial of petition to repatriate after an expert psychologist opined that returning the boy and girl to France, where they had been abused by their father, would likely trigger recurrence of PTSD, and that no arrangement could mitigate this risk). The holding in Blondin IV depended on the fact, due to the nature of the potential harm at issue – recurrence of PTSD that would occur as soon as the children entered France – there was nothing the courts could do to prevent it. In this case, there is nothing in the record beyond speculation that Shayan would suffer unavoidable psychological harm if returned to Singapore. Neither party nor the guardian ad litem requested a psychological evaluation of the boy, and the guardian ad litem reported, after observing Shayan's interactions with both parents and interviewing him separately, that the boy appeared to be an active and happy

14

child, who seemed distressed about the difficulties between his parents. Shayan expressed unqualified love for both parents and indicated that he was never physically disciplined and never saw or heard either parent hit the other or try to hurt the other parent. These observations are consistent with the reports to the Singapore Subordinate Court by Singapore's Centre for Family Harmony, which supervised and reported on Souratgar's visits with the boy. In contrast, the girl in Blondin IV had herself been abused and expressed fear of her father.

The circuit court cases affirming denial of repatriation cited by Lee are distinguishable in that the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question. See Khan v. Fatima, 680 F.3d 781, 787 (7th Cir. 2012) (daughter told social worker she was "scared" of her father); Simcox, 511 F.3d at 608 (father subjected children to "repeated beatings, hair pulling, ear pulling, and belt-whipping" and psychological abuse); Van de Sande, 431 F.3d at 570 (father spanked daughter and threatened to kill wife and children); Walsh v. Walsh, 221 F.3d 204, 221-22 (1st Cir. 2000) (one child diagnosed with PTSD as a result of physical abuse and father repeatedly violated court orders); Blondin II, 189 F.3d at 243 (father tied cord around daughter's neck and threatened to kill mother and daughter); see also Baran v. Beaty, 526 F.3d 1340, 1346 (11th Cir. 2008) (despite the absence of any evidence of past abuse of the

15

child by the father, the father was found to be frequently drunk, emotionally unstable, and to have threatened the child and verbally and physically abused the mother in the child's presence); Danaipour v. McLarey, 286 F.3d 1, 5-8 (1st Cir. 2002) (father may have sexually abused the daughter). In distinguishing the foregoing cases, we do not mean to suggest that only evidence of past parental abuse of the child, past parental threats to the child or the child's fear of a parent can establish a successful Article 13(b) defense. We only hold that in this case, the evidence, which does not match the showing in those cases, does not establish that the child faces a grave risk of physical or psychological harm upon repatriation.

Lee contends that the district court erred in discounting the likelihood that Shayan would be exposed to renewed domestic strife and suffer grievous psychological harm upon his return to Singapore. She also faults the district court for refusing to credit expert testimony characterizing Souratgar as having a coercive and controlling personality type with a tendency to hurt women and children. At the hearing, the district court heard the psychological expert testimony of Dr. B.J. Cling, who described abusive spouses of the "coercive control" type and of the "situational" type and placed Souratgar in the former category. The coercive control type is said to demand domination and control and grows more dangerous upon separation from the victim. On this

basis, Dr. Cling concluded that Souratgar still poses an "extreme danger" to Lee even though they had been estranged for more than a year. Dr. Cling's assessment of Souratgar was based entirely on Lee's answers to a survey, which the district court found to contain inaccuracies. The district court therefore discredited Dr. Cling's conclusions. Our review of the record yields no basis for disagreement with the district court's finding.[5] For us to hold evidence of spousal conflict alone, without a clear and convincing showing of grave risk of harm to the child, to be sufficient to decline repatriation, would unduly broaden the Article 13(b) defense and undermine the central premise of the Convention: that wrongfully removed children be repatriated so that questions over their custody can be decided by courts in the country where they habitually reside. Simcox, 511 F.3d 594 at 604. Our holding today is not that abuse of the kind described by Lee can never entitle a respondent to an Article 13(b) defense; rather it depends on the

---

[5] In rejecting Dr. Cling's "coercive control" analysis, the district court stated that the evidence did not "support any conclusion that petitioner is an obsessed or jilted lover who seeks to be reunited with respondent or prevent others from being with her." Souratgar, 2012 WL 6700214, at *10. Although we find no error in the district court's substantive treatment of Dr. Cling's testimony, she did not testify that Souratgar was controlling because he had been "jilted." The arguments of Lee and amici regarding the risk of violence from a formerly abusive spouse do not depend on any such characterization, and we disclaim any suggestion that only a person dealing with an "obsessed or jilted lover" might face such a risk. As we have explained, however, we find no clear error in the district court's finding that the facts here do not indicate a grave risk of harm to the child in this particular instance.

17

district court's finding that Shayan would not be in danger of being exposed to a grave risk of physical or psychological harm and that the Singapore court system has demonstrated its ability to adjudicate the dispute over his custody.

### 2.  Risk of abuse by the father

Lee also contends that Shayan faces a direct risk of harm from his father, who, having been abusive to Lee, is also likely to turn on Shayan.  In support of this assertion, amici cite the description of the "coercive control" type in the social science literature that draws certain correlations between perpetrators of spousal abuse and child abuse.  However, given the problems with Dr. Cling's methodology in type-casting Souratgar, the lack of any indicia of ill-will on the part of Souratgar toward Shayan, and contrary credited evidence of a loving father-son relationship, there is no clear and convincing showing in the record that the boy faces a grave risk of harm from his father.

### 3.  "Grave risk" arising from loss of the mother

Lee also posits various scenarios in which the boy would be deprived of his mother post-repatriation.  She claims Souratgar may (a) resort to Syariah court proceedings in Singapore or Malaysia to win custody outright; (b) abscond with Shayan to Iran; or (c) expose her to the charge of apostasy (leaving the Muslim faith), a religious crime punishable by death in her home country of

18

Malaysia. The district court dismissed these claims as lacking factual support.

As an initial matter, we cannot conclude that the prospect that one parent may lose custody of the child, post-repatriation, necessarily constitutes a grave risk to the child under the Convention. Since the Convention defers the determination of custody to courts in the country where the child habitually resides, it is quite conceivable that in some cases one or the other parent may lose legal custody after repatriation and be deprived of access to the child. Thus, the possible loss of access by a parent to the child does not constitute a grave risk of harm per se for Article 13(b) purposes. See Charalambous, 627 F.3d at 469 ("[T]he impact of any loss of contact with the Mother is something that must be resolved by the courts of the Children's habitual residence." (quotation marks omitted)). But even assuming that the prospect of the child losing his mother poses a grave risk to the child's well-being, there is no basis to disturb the district court's finding that Lee has not made a clear and convincing showing that any of the scenarios that she raised is likely to occur.

### a. Loss of custody through Syariah Court proceedings

Lee argues that Souratgar's attainment of custody in a Syariah Court is preordained. The district court heard expert testimony that under Islamic law, a woman's testimony may be entitled to less weight than a man's and there are presumptions in custody

19

determinations that favor fathers over mothers and Muslims over non-Muslims. Lee has not shown, however, that the question of custody is likely to be decided by a Syariah Court upon repatriation, much less that such courts are predisposed to reach a certain outcome. If anything, the record is to the contrary. Lee successfully obtained a dismissal of the order of the Malaysia Syariah Court, which had awarded the couple joint custody, for lack of jurisdiction. Furthermore, her aspersions on Syariah proceedings in Singapore are inconsistent with her consent in February 2012 to have custody decided by that court.

Moreover, the Singapore Syariah Court has pendant, not exclusive jurisdiction, to hear child custody matters among Muslim couples. By statute, divorce actions between individuals of the Muslim faith, a religious minority in Singapore, must be brought in the country's Syariah Court. Administration of Muslim Law Act ("AMLA") § 35(2)(b)(2013)(Sing.). But any party to a divorce proceeding before the Syariah Court may apply for leave to have custody decided by a secular court. Id. § 35A(1)&(2). And when both parties consent, they do not need to apply for leave in the Syariah Court to have custody matters decided in a secular court. Id. § 35A(5)-(7). Souratgar has committed to pursue any custody proceedings, upon repatriation, in Singapore's civil courts. Even if this undertaking is unenforceable, as Lee insists, she may still invoke it, as well as this Court's decision, in any application to

20

transfer the custody determination from the Singapore Syariah Court under AMLA § 35A(1).  In light of these options, we cannot fault the district court's conclusion that Lee failed to make a sufficient showing that the question of custody will be decided by a Syariah Court.[6]

### b.    Risk of father's flight to Iran

Lee also claims that Souratgar will abscond with Shayan to Iran to subvert the custody proceedings in Singapore.  She testified that Souratgar has expressed a preference for Iranian military schooling for the boy, that he would like to take Shayan to see the boy's paternal grandparents in Iran, and that he has considered the possibility of relocating his business activity to that country.  The district court, however, found no credible showing that Souratgar would abduct the boy to Iran or any other country in violation of a court order, and we discern no error in this finding.  See Charalambous, 627 F.3d at 469 (denying relief under Article 13(b) where mother's "subjective perception of a threat . . . was not corroborated by other evidence in the record" (quotation marks omitted)); Walsh, 221 F.3d at 221 (granting relief after concluding that relying on courts to provide protection had "little chance of working" given the respondent's history of violating court orders).  We cannot fail to observe, moreover, that

---

[6]    Lee also claims that Souratgar schemed to deprive her of her Malaysian citizenship and jeopardize her ability to contest Shayan's custody in Singapore.  We have considered this argument and find it to be without merit.

21

unlike Lee, Souratgar has to date honored the legal requirements of the courts in Singapore.

### c. Apostasy

Finally, Lee claims that Souratgar exposed her to being charged with apostasy, which she says, is a capital offense in Malaysia and thus created a "grave risk" that Shayan would lose his mother. This claim is based on the testimony of Yasmeen Hassan, Lee's expert witness on Islamic law, who testified that apostasy is punishable by death in Malaysia. The claim distorts both the facts and law. Souratgar did not accuse Lee of leaving the faith. In his attempt to obtain access to Shayan in Malaysia, Souratgar filed an affidavit with Malaysia's Syariah Court reporting that Lee had committed certain acts in violation of Islamic law, such as selling cakes containing alcohol online and attending church. Additionally, although punishment for those who abandon the Muslim faith has been debated in Malaysia, the national government has consistently blocked any formal implementation of rules concerning apostasy. See Kikue Hamayotsu, Once a Muslim, Always a Muslim: The Politics of State Enforcement of Syariah in Contemporary Malaysia, 20 S. E. Asia Research 399, 400 (2012); Abdullah Saeed & Hassan Saeed, Freedom of Religion, Apostasy and Islam 19 (2004). Hence, there is no indication that Lee could even be charged with apostasy in Malaysia, much less face the death penalty.

22

### D. Lee's Article 20 defense

The Article 20 defense allows repatriation to be denied when it "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." U.S. State Dep't, Hague International Child Abduction Convention: Text and Legal Analysis, Pub. Notice 957, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986). The article is to be "restrictively interpreted and applied." Id. Article 20 is a "unique formulation" that embodies a political compromise among the states that negotiated the Convention, which "might never have been adopted" otherwise. Id. The defense is to be invoked only on "the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." Id. It "is not to be used . . . as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed." Id. We note that this defense has yet to be used by a federal court to deny a petition for repatriation. Fed. Jud. Ctr., The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 85 (2012).

In urging the Article 20 exception in this case, Lee insists broadly that Syariah Courts are incompatible with the principles "relating to the protection of human rights and fundamental freedoms" of this country. While this general assertion might find

23

sympathy among some in this country as a political statement, we decline to make this categorical ruling as a legal matter. Moreover, Lee has failed to show that the issue of custody is likely to be litigated before Singapore's Syariah Court.  Given that failure, we are not inclined to conclude simply that the presence of a Syariah Court in a foreign state whose accession to the Convention has been recognized by the United States is per se violative of "all notions of due process."[7]  51 Fed. Reg. 10,510 (Mar. 26, 1986).

We are also mindful of the need for comity, as "[t]he careful and thorough fulfillment of our treaty obligations stands not only to protect children abducted to the United States, but also to protect American children abducted to other nations-whose courts, under the legal regime created by this treaty, are expected to offer reciprocal protection."  Blondin II, 189 F.3d at 242.  In the exercise of comity, "we are required to place our trust in the court of the home country to issue whatever orders may be necessary to safeguard children who come before it."  Id. at 248-49; cf. Carrascosa v. McGuire, 520 F.3d 249, 261-63 (3d Cir. 2008) (criticizing a Spanish court for construing an agreement not to take child out of the United States without the consent of both

---

[7]    Indeed, such a holding would contradict the State Department's view expressed upon Singapore's accession as a bilateral partner under the Convention last year, that Singapore is a "role model" among states in the region.  United States and Singapore become Hague Abduction Convention Partners, U.S. Dep't of State, May 3, 2012, http://www.state.gov/r/pa/prs/ps/2012/05/189236.htm.

parents as violating fundamental rights under the Spanish Constitution for citizens to travel and choose their place of residence and using Article 20 to justify denial of repatriation).

For all of the above reasons, we conclude that the district court did not err in rejecting Lee's Article 20 defense.

**III. Conclusion**

We have considered all of Lee's remaining arguments and find them to be without merit. For the foregoing reasons, the district court's grant of Souratgar's petition for his son's repatriation is AFFIRMED.