2020 IL App (1st) 191762

FIRST DISTRICT
FOURTH DIVISION
December 3, 2020

No. 1-19-1762

IN RE THE PARENTAGE OF M.V.U.:

Rocio Montes,

        Petitioner-Appellee,

v.

Jose Guadalupe Ignacio Ulloa Toscano,

        Respondent-Appellant.

)  Appeal from the
)  Circuit Court of
)  Cook County
)
)
)
)  No. 18 D 79090
)
)
)
)  Honorable
)  Mary S. Trew,
)  Judge Presiding.
)

JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Hall and Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1    We begin by acknowledging the unique procedural posture of this case. This matter commenced as a parentage action in the circuit court of Cook County filed by petitioner, Rocio Montes (Rocio), against respondent Jose Guadalupe Ignacio Ulloa Toscano (Jose) seeking an acknowledgement of parentage and child support for their daughter M.V.U. During the pendency of the parentage petition, however, Jose filed a petition to return his daughter under the Hague Convention (22 U.S.C. § 9001) (Hague petition) and the Uniform Child Custody

Jurisdiction and Enforcement Act (UCCJEA) (750 ILCS 36/201 (West 2018)). As a result, the parentage petition was stayed while litigation proceeded on the Hague petition. After an evidentiary hearing, the circuit court determined that while Rocio wrongfully removed M.V.U. from Mexico, Rocio proved by clear and convincing evidence that she was justified in doing so because the child was subject to a grave risk of harm. Jose now appeals this ruling, arguing that the circuit court erred in its determination where the evidence failed to demonstrate that Rocio met her burden. Because we conclude there was clear and convincing evidence supporting this defense, we affirm the judgment of the circuit court.

¶ 2                                    BACKGROUND

¶ 3      For the purposes of the issue on appeal, we recite only those facts relevant to the disposition of the case.

¶ 4      Rocio (a citizen of Mexico and the United States) and Jose (a citizen of Mexico) had a daughter together, M.V.U. (a citizen of Mexico and the United States), in 2014. The parties were never married. The child was born and resided in Guadalajara, Jalisco, Mexico until September 29, 2017, when Rocio moved to Chicago with the child.

¶ 5      On January 19, 2018, Rocio filed a petition in the circuit court to establish parentage, custody, and child support as well as permission to change her daughter's name.

¶ 6      After being served with the parentage petition, Rocio obtained a default judgment. Two days before the matter was set for prove up, Jose filed a motion to vacate the default judgment order. On July 11, 2018, Jose was granted 30 days to file a response or otherwise plead to Rocio's parentage petition.[1] In August 2018, Jose filed a Hague petition entitled "Verified

_____

[1] We observe that the order granting Jose leave to respond to the petition did not expressly vacate the default judgment. No order vacating this judgment is included in the record on appeal.

- 2 -

Petition for Return of Child Under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act" in August 2018. Jose alleged he is the child's father and the child was wrongfully taken by Rocio from her habitual residence in Guadalajara, Jalisco, Mexico on September 29, 2017, and now resides in Chicago with Rocio. Jose further alleged that he has was living with the child at the time she was removed from Mexico and has exercised custody rights over her since her birth. The court stayed Rocio's parentage petition until further order of court. [2]

¶ 7       On September 12, 2018, Rocio filed an answer to the Hague petition as well as affirmative defenses. Pertinent to this appeal, Rocio denied that Mexico was the child's habitual residence and that Jose was carrying out his responsibilities towards their daughter. Rocio asserted three affirmative defenses; however, the affirmative defense at issue in this appeal is the grave risk exception under Article 13(b) of the Hague Convention. In regard to that affirmative defense, Rocio alleged Jose was verbally, emotionally, and physically abusive towards her while they were living together in Mexico. She asserted three specific allegations of abuse. The first allegation involved a March 2017 argument where Jose grabbed her by the neck while she was holding their two-year-old child and choked her. Rocio asserted that her aunt, Maria de Lourdes Lozano Flores (Flores), heard her cry out and witnessed Jose choking her. The second allegation occurred in January 2016 where the parties were arguing and Jose yelled, "If you move back to Chicago, I'll kill you first before you take my baby." The final allegation was that in August 2017, the parties argued over Rocio's desire to work outside of the home and have the child attend school. According to Rocio, Jose refused to allow her to leave the home to work.

_____

[2] Article 16 provides that "until it has been determined that the child is not to be returned under the Convention," the state to which the child has been removed "shall not decide on the merits of rights of custody." Hague Convention, art. 16.

¶ 8    In support of her affirmative defenses, Rocio attached affidavits from her family members.  Each of these affidavits was written in Spanish and was accompanied by a notarized certificate of translation.  The first affidavit was from Flores, Rocio's aunt.  She attested that she resided next door to Rocio in Mexico and she was able to hear the arguments she and Jose had.  In April 2017, she heard "a lot of yelling" coming from Rocio's home and she went into the house to see what was happening.  When she came in "[Rocio's] boyfriend Jose Guadalupe Ignacio Ulloa Toscano was holding her by the neck trying to choke her and as soon as he saw me he let her go."  She further attested that she "often would hear how he would threaten [Rocio] with not letting her go to work or take her daughter to her sister's house for visits, nor take her to Chicago with her family.  His phrase was always 'calale' (try me).  Letting her know that if she contradicted him, there would be consequences.  He always tried to manipulate her, and everything was bad to Jose ***."

¶ 9    Rocio's uncle, Jose Santana Lopez, also submitted an affidavit in which he averred he helped take Rocio to the airport on September 29, 2017, at 3:30 a.m. "since she had to flee the mistreatments of her boyfriend Jose."

¶ 10    Rocio's sister, Cynthia Lizette Montes Lozano, averred that Rocio and Jose "have always been fighting."  Jose did not let Rocio work, even when he was unemployed and was mad when Rocio went to work as an English teacher.  According to Cynthia, "On several occasions my sister Rocio Montes would kick her boyfriend Jose Guadalupe Ignacio Ulloa Toscano out of the house because they would fight daily, and she didn't want her daughter to witness daily fights and mistreatments."

¶ 11    Rocio's grandfather, Jose Gilberto Montes Duenas (Duenas), averred that he resides in Chicago and has a vacation home in Guadalajara, Jalisco, Mexico.  Between May 24, 2015, and

September 29, 2017, he loaned his vacation home to Rocio so she could live there with the child. On some occasions, Jose would sleep over. Duenas further testified that Jose was "always in a bad mood."

¶ 12    Jose filed a reply to Rocio's affirmative defenses in which he denied all of her allegations.

¶ 13    Jose moved for judgment on the pleadings pursuant to section 2-615(e) of the Code of Civil Procedure (Code) (735 ILCS 5/2-615(e) (West 2018)).[3]   After hearing arguments from both parties, the circuit court granted Jose's section 2-615(e) motion as to two issues. First, the circuit court found there was no material issue of fact with regard to the issue of habitual residence of the minor child, that being the country of Mexico. Second, the circuit court found that there was no material issue of fact with regard to the exercise of custodial rights by Jose at the time of removal. Therefore, the circuit court granted the section 2-615(e) motion as to those issues only.

¶ 14                              Evidentiary Hearing[4]

¶ 15    Having determined that Jose's Hague petition met the *prima facie* requirements for a wrongful removal determination, the circuit court conducted an evidentiary hearing on Rocio's affirmative defenses. The circuit court heard testimony from Jose, Rocio, Denise Montes (Rocio's sister), and Duenas (Rocio's grandfather). As the sole issue on appeal is whether the circuit court properly found that the grave risk exception applied, we limit the recitation of the

---

[3] The record does not contain a written motion for judgment on the pleadings. However, there is no dispute between the parties that Jose made this motion orally. The record is further devoid of any other motions made in conjunction with this petition.

[4] The evidentiary hearing was conducted with the assistance of a Spanish language interpreter.

facts to that specific issue.[5]

¶ 16    Jose testified with the assistance of a Spanish language interpreter as follows. The child was born in Jalisco, Mexico. At that time he was not residing in Jalisco, but would visit each weekend. In the middle of 2016, he moved into Duenas' home in Jalisco to live with Rocio and the child. Jose denied having a difficult relationship with Rocio.

¶ 17    As to the March 2017 incident, Jose testified they were inside Duenas' home and they were arguing. While they were arguing, Flores (Rocio's aunt) came inside the house. He denied getting angry with Rocio, raising his voice, and touching her. Jose further testified that after this incident they continued to reside together.

¶ 18    Regarding the alleged January 2016 argument, Jose testified that it was a discussion, not an argument. Jose denied saying that if Rocio tried to take the child to Chicago he would kill Rocio. Jose also denied telling Rocio that her job was to stay home and take care of the baby. According to Jose, Rocio decided on her own to quit her job.

¶ 19    On cross-examination, Jose testified that he never hit or choked Rocio and he never physically abused their daughter.

¶ 20    Rocio testified in Spanish with the assistance of a Spanish language interpreter. Rocio testified she met Jose in 2005 while she was living in Jalisco. After she informed him she was pregnant Jose demanded she obtain an abortion. Rocio disagreed and Jose moved out. Almost two years after the child was born Jose moved in with her in March 2016. Regarding the March 2017 argument, Rocio testified that they were arguing about her going to the United States to

---

[5] After Rocio presented her case-in-chief, Jose moved for a directed finding as to all three of her affirmative defenses. The circuit court granted the directed finding as to the other two affirmative defenses. The circuit court's determination as to these directed findings is not at issue on appeal.

visit her family—Jose did not want her to go. During the argument, Jose choked her with one hand while she was holding their two-year-old child. She was screaming for him to stop when her aunt came into the room and he let go. After that fight, she stayed in her bedroom with the child and kept the door locked. Jose slept in a different room.

¶ 21    Regarding the January 2016 incident, Rocio testified that Jose threatened to kill her if she moved to Chicago with the child. She also testified that in August 2017 she obtained employment at a school as an English teacher. The school would allow the daughter to attend kindergarten for free. Jose did not want her to go to work or for their child to attend school, so he threatened her and she only worked there for a few days as a result.

¶ 22    In addition, Rocio testified that there were other incidents where Jose threatened her. In September 2017, she wanted to visit her sister (who resided in the same town) and he threatened her so she would not go. According to Rocio, she did not report Jose to the police because she does not trust the police. She was also scared of Jose and believed that she and her daughter are in physical danger from him.

¶ 23    Denise Montes, Rocio's sister, testified that in August 2017 Rocio called her during an argument with Jose and told her Jose was not allowing her to work and take the child to school. According to Denise, Rocio sounded upset, angry, and sad. She also heard Jose in the background through the phone. Denise testified that Jose sounded "very upset" and that he was speaking loudly. She heard him say he did not want Rocio to work because "it was not her duty and that if she did she should expect the consequences."

¶ 24    Rocio's grandfather, Duenas, testified that he owns the property where Rocio and Jose stayed in Jalisco, Mexcio. According to Duenas, he had very little contact with Jose, but when he observed Jose he appeared as though he was not happy.

¶ 25    Rocio rested and Jose declined to put on any other evidence. After obtaining written closing arguments the circuit court took the matter under advisement.

¶ 26    On April 11, 2019, the circuit court issued a written memorandum order denying Jose's Hague petition. In doing so, the circuit court determined that Rocio was "a highly credible witness" and that Jose was not a credible witness. The court further found that Denise's testimony was credible, and the grandfather's testimony was not relevant to the issue at bar. The circuit court then made the following findings of fact:

> "The sister, Denise, who lives in Chicago, testified to the fact that she overheard conversations between Jose and Rocio while on the telephone in mid-August 2017 with Rocio. The topic of conversation she overheard between Jose and Rocio was Jose saying 'no' to Rocio working. She described Jose as saying 'no' and speaking to Rocio in a loud and upset tone of voice. The call was initiated by Rocio to Denise. On cross-examination Denise said there were several phone calls to her during this same time period about the same topic."

¶ 27    In regard to Rocio's testimony, the circuit court made the following findings about the March 2017 argument:

> "[Rocio] described an argument where, in March 2017 while she was holding the baby, Jose began choking her with one hand. Rocio began screaming, and Jose stopped the assault when Rocio's Aunt walked in. She told Jose to leave and he left for a couple of weeks and then returned. Rocio testified on cross examination that in January 2016, Jose threatened to kill her, and then he moved in two months later. Rocio testified she did not call the police because she believed the local police to be corrupt. She admitted on cross examination that she continued to reside with Jose until August 2017. Rocio testified as

to the fact that, in August 2017, Jose prohibited her from working as an English teacher where she could have also had free childcare. She testified that she resigned on the third day because Jose told her she could not work. In September 2017 Rocio left Mexico with the minor child and traveled to the United States. She did not inform Jose."

¶ 28 The circuit court found the following facts regarding Jose's testimony:

"He testified he moved in with Rocio in 2016, and while he does not remember the month, he thinks it was in the middle of the year. He testified that Rocio's parents moved back to Chicago in May 2016. He said that he and Rocio did not have a difficult relationship, but, like all couples, they did argue. Jose acknowledged that there was an argument in March 2017 in Rocio's grandparent's [*sic*] house. He claimed that Rocio was not holding the baby, and that the baby was outside with no one watching her. He testified (as did Rocio) that Rocio's Aunt came in because she heard the argument. He denied being angry or raising his voice, but acknowledge that the Aunt heard the commotion. He denied choking Rocio. He also denied that Rocio asked him to move out in August 2017."

¶ 29 Based on these findings of fact and the court's assessment of the witnesses' credibility, the circuit court found by clear and convincing evidence that there was a grave risk that the return of the minor child would expose her to physical or psychological harm or otherwise place the child in an intolerable situation.

¶ 30 On May 10, 2019, Jose filed a motion to reconsider the April order, which the trial court denied. The trial court further found that the April 11, 2019, order was final and appealable pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) and that there was no just reason to delay its enforcement or appeal. This appeal followed.

¶ 31                                    ANALYSIS

¶ 32    We initially observe that while state and federal courts share concurrent jurisdiction over

Hague petitions, most are brought in federal courts.  See 42 U.S.C. § 11603(a), (b), (d).  This is

especially true in Illinois as this court has had no opportunity to review a respondent's grave risk

defense.  Therefore, we must look outside our Illinois jurisprudence.  Although federal law and

the law of those states outside of Illinois do not have any precedential value, we may consider

this case law as persuasive authority.  See *Duncan v. FedEx Office and Print Services, Inc.*, 2019

IL App (1st) 180857, ¶ 20; see also *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL

113836, ¶ 53 ("we may afford a Seventh Circuit decision more persuasive value than we would

the decisions of other federal courts, provided it is reasonable and logical").

¶ 33                                Hague Convention

¶ 34    We begin our analysis with some background on the Hague Convention, which was

implemented in the United States by the International Child Abduction Remedies Act (22 U.S.C.

§ 9001 *et seq*.) "[t]o address the problem of international child abductions during domestic

disputes."  *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014) (internal quotation marks omitted).

It provides that a child wrongfully removed from her country of "habitual residence" ordinarily

must be returned to that country.  *Monasky v. Taglieri*, 140 S.Ct. 719, 722-23 (2020).  Both the

United States and Mexico are Hague Convention signatories.  It is the Hague Convention's core

premise that "the interests of children *** in matters relating to their custody" are best served

when custody decisions are made in the child's country of "habitual residence."  Hague

Convention Preamble, Treaty Doc., at 7; see *Abbott v. Abbott*, 560 U.S. 1, 20 (2010).

¶ 35    The Hague Convention recognizes certain exceptions to the return obligation.  See

*Lozano*, 572 U.S. at 5; *Chafin v. Chafin*, 568 U.S. 165, 169 (2013).  Prime among them, a child's

return is not in order if the return would place her at a "grave risk" of physical or psychological harm or otherwise in "an intolerable situation." 42 U.S.C. § 11603(e)(2)(A); Hague Convention, art. 13(b); see *Monasky*, 140 S. Ct. at 723. This provision has been recognized by the United States Supreme Court as "a mechanism for guarding children from the harms of domestic violence." *Monasky*, 140 S. Ct. at 729; see also *Khan v. Fatima*, 680 F.3d 781, 786 (7th Cir. 2012) (credible testimony of spousal abuse, carried out in the presence of the child at issue, supports a finding that return of the child to the abuser poses a grave risk of at least psychological harm).

¶ 36                    Standard of Review – Denial of a Hague Petition

¶ 37    We review the factual findings of the circuit court for clear error but determine *de novo* whether those facts establish a grave risk of harm. *Ortiz v. Martinez*, 789 F.3d 722, 728 (7th Cir. 2015); *Ermini v. Vittori*, 758 F.3d 153, 160 (2d Cir. 2014); *Cuellar v. Joyce*, 596 F.3d 505, 509 (9th Cir. 2010). "Clear-error review has a particular virtue in Hague Convention cases. It has been observed by the Supreme Court that, as a deferential standard of review, clear-error review speeds up appeals and thus serves the Convention's premium on expedition." *Monasky*, 140 S. Ct. at 730.

¶ 38                                    Grave Risk

¶ 39    On appeal, Jose maintains that the only issue is whether Rocio established that return to Mexico would place the child at "grave risk of harm" under the demanding standard of clear and convincing evidence. Jose argues that the two isolated incidents (the March 2017 choking incident and the January 2016 threat) do not rise to the level of grave risk.

¶ 40    Since the adoption of the Hague Convention, there has been a shift toward recognizing domestic violence as posing a grave risk toward the child. This shift commenced in 1990 when a

congressional resolution passed which specifically found that "children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser" and "the effects of physical abuse of a spouse on children include *** the potential for future harm where contact with the batterer continues [because] *** children often become targets of physical abuse themselves or are injured when they attempt to intervene on behalf of a parent." H.R. Con. Res. 172, 101st Cong., 104 Stat. 5182, 5182 (1990); see also *Gomez v. Fuenmayor*, 812 F.3d 1005, 1014 (11th Cir. 2016) (it "requires no stretch of the imagination to conclude that serious, violent domestic abuse repeatedly directed at a parent can easily be turned against a child"). The courts commenced recognizing these concepts around 2000 and stated so in *Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000). In that case, the First Circuit gave express recognition to the fact that the exposure of a child to domestic violence is a sufficient risk to preclude the child's return under the Convention. *Id.* Recently, the grave risk defense was also recognized by the United States Supreme Court as "a mechanism for guarding children from the harms of domestic violence." *Monasky*, 140 S. Ct. at 729.

¶ 41    A review of the case law in this area, however, reveals that a judicial consensus has not emerged. While some federal courts read the grave risk defense narrowly (see *Simcox v. Simcox*, 511 F.3d 594, 607 (6th Cir. 2007)) others, including our Seventh Circuit, have a broader view, recognizing that domestic violence toward a spouse can amount to grave risk of psychological injury to the child. See *Van De Sande v. Van De Sande*, 431 F.3d 567, 571 (7th Cir. 2005); *Khan*, 680 F.3d at 787; see also *Walsh*, 221 F.3d at 220 ("both state and federal law have recognized that children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser"); *Gomez*, 812 F.3d at 1014 (holding that "ruling to the contrary would artificially and unrealistically ignore the powerful effect that a pattern of

serious violence directed at a parent may have on his children."); *Noergaard v. Noergaard*, 244 Cal. App. 4th 76, 84 (2015) ("domestic violence or child abuse constitutes a grave risk to the child"). The Seventh Circuit has made clear that "[i]f handing over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense that the parent may with some nonnegligible probability injure the child, the child should not be handed over[.]" *Van De Sande*, 431 F.3d at 571. In fact, some courts have found that a threat to kill a child or a history of domestic violence qualifies as a grave risk. See *id*. at 570; see also *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014); *Mohacsi v. Rippa*, 346 F.Supp.3d 295, 321 (E.D.N.Y. 2018) (finding the respondent met her burden of demonstrating a grave risk of harm where the petitioner engaged in a prolonged course of abuse of the respondent that included an incident where he "nearly choked her to death" and had threatened to kill her).

¶ 42    The Second Circuit has characterized the grave risk exception as follows:

> "[A]t one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former does not constitute a grave risk of harm under Article 13(b); the latter do." *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001).

Although "[s]poradic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk," the Second Circuit has recognized that "[e]vidence of prior spousal abuse, though not directed at the child, can support the grave risk of harm defense, as could a showing of the child's exposure to such abuse." *Souratgar v. Lee*, 720 F.3d 96, 104

(2d Cir. 2013) (quotation marks, citation, and alterations omitted); *see also Ermini*, 758 F.3d at 164-65 (noting spousal abuse can establish a grave risk of harm to the child in certain circumstances).

¶ 43    The State Department, however, has cautioned that "the person opposing the child's return must show that the risk to the child is grave, not merely serious," and has stressed that Article 13(b) "was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494; *see Blondin*, 238 F.3d at 162 n. 10 (according "great weight" to the State Department's interpretation of the Convention). But, as previously established herein, there is an exception "where the petitioner showed a 'sustained pattern of physical abuse and/or a propensity for violent abuse' that presented an intolerably grave risk to the child." *Souratgar*, 720 F.3d at 104 (quoting *Laguna v. Avila*, No. 07-CV-5136 (ENV), 2008 WL 1986253, at *8 (E.D.N.Y. 2008)); *see also Baran v. Beaty*, 526 F.3d 1340, 1352 (11th Cir. 2008) (affirming district court's finding of grave risk due to the credible evidence that the father was "a violent and abusive man with a lengthy history of inflicting physical and psychological abuse on those he ostensibly loves the most"). As observed by the First Circuit, the alleged harm "must be a great deal more than minimal" and "greater than would normally be expected on taking a child away from one parent and passing him to another." *Walsh*, 221 F.3d at 218 (internal quotation marks omitted).

¶ 44    Based on the case law, we find the circuit court properly considered the evidence presented in this case and correctly determined that Rocio proved by clear and convincing evidence a grave risk of harm or otherwise an intolerable situation under Article 13(b). See 42 U.S.C. § 11603(e)(2)(A); Hague Convention, art. 13(b); see *Monasky*, 140 S. Ct. at 723. The

evidence and testimony presented in support of this defense demonstrated a pattern of escalating violence as well as a pattern of interference with Rocio's personal liberty which, in turn, effected the psychological welfare of the child. Rocio's testimony (which the circuit court found to be credible) indicated that Jose's interference with her personal liberty commenced when she became pregnant with the child and he demanded she obtain an abortion. After the child was born, Jose did not reside with the child nor did he provided any support to Rocio or the child. It was only in mid-2016 that Jose began living with Rocio and the child, but the evidence demonstrated he still did not provide for their financial support. In fact, the record demonstrates Jose made no effort to establish or assert his parentage of the child in any legal or administrative forum.

¶ 45     Rocio's testimony and the testimony of her various family members established that she and Jose were frequently arguing and these arguments—at times—were witnessed by the child. These arguments escalated into threats, with Jose threatening to kill Rocio on various occasions if she were to leave him and take the child with her. These threats interfered with Rocio's personal liberty as demonstrated by the fact that when she did decide to leave Jose, she did so secretly with the assistance of her family members during the middle of the night while Jose was asleep.

¶ 46     Rocio further established that Jose was more than capable and willing to follow through on his threats of physical harm when she testified regarding the March 2017 argument where they argued about Rocio desiring to return to the United States with the child. Jose did not want her to return and he choked her while she was holding the child. This instance of physical abuse was corroborated by the testimony of Rocio's aunt who witnessed Jose choking Rocio. The circuit court found Rocio's testimony regarding this instance of physical abuse to be credible.

See *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004) ("The trial court is in the best position to review the evidence and to weigh the credibility of the witnesses."). As observed by the Seventh Circuit, "Under the clear error standard, we will not overturn the district court's factual findings unless, after reviewing all the evidence, we are 'left with [a] definite and firm conviction that a mistake has been [made]." *Ortiz*, 789 F.3d at 728. "In other words, a district court's credibility findings are 'binding on appeal unless the -court] has chosen to credit *exceedingly* improbable testimony.' " (Emphasis in original.) *Id.* at 729. Our review of the record reveals that the circuit court did not chose to credit "exceedingly improbable testimony" and, in fact, much of it was corroborated, albeit by Rocio's family members. *Id.*

¶ 47 In addition, Rocio demonstrated that Jose interfered with her personal liberty when he prohibited her from working as a teacher outside the home. While Jose testified Rocio quit the position based on her own free will, the circuit court determined Rocio to be credible while at the same time found Jose not to be credible. The circuit court was also presented with the testimony of Rocio's sister Denise who testified that she overheard arguments between Rocio and Jose regarding Rocio's desire to be employed. We see no reason on the record to disagree with the circuit court's credibility findings and, in fact, afford them great deference. See *In re Marriage of Bates*, 212 Ill. 2d at 515.

¶ 48 In total, Rocio's evidence clearly and convincingly established a pattern of escalating domestic abuse beginning with Jose's demand she obtain an abortion and ending with him choking her while she held the child in her arms and making repeated threats on her life. In our view, the evidence demonstrates that the child faces "a real risk" of being hurt psychologically due to her witnessing these events. *Souratgar*, 720 F.3d at 103 (domestic violence can satisfy the grave risk defense when a "sustained pattern of physical abuse *and/or a propensity* for

violent abuse" is demonstrated by clear and convincing evidence) (Emphasis added.). For this court to set aside the circuit court's credibility and factual findings and grant Jose's Hague petition would be to ignore the fact that domestic violence toward a partner does cause grave harm to the child or place the child in an intolerable situation. As recognized by the First Circuit, "credible social science literature establishes that serial spousal abusers are also likely to be child abusers." *Walsh*, 221 F.3d at 220 (citing Jeffrey L. Edleson, *The Overlap Between Child Maltreatment and Woman Battering*, 5 Violence Against Women 134 (1999); Anne E. Appel & George W. Holden, *The Co-Occurrence of Spouse and Physical Child Abuse: A Review and Appraisal*, 12 J. Fam. Psychol. 578 (1998); Lee H. Bowker et al., *On the Relationship Between Wife and Child Abuse, in* Kersti Yllo & Michele Bograd, *Feminist Perspectives on Wife Abuse* 158 (1988); Susan M. Ross, *Risk of Physical Abuse to Children of Spouse Abusing Parents*, 20 Child Abuse & Neglect 589 (1996)). The First Circuit also recognized that "both state and federal law have recognized that children are at an increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser." *Id.* (quoting H.R. Con. Res. 172, 101st Cong., 104 Stat. 5182, 5182 (1990) ("Whereas the effects of physical abuse of a spouse on children include *** the potential for future harm where contact with the batterer continues; *** Whereas children often become targets of physical abuse themselves or are injured when they attempt to intervene on behalf of a parent")).

¶ 49    In that vein, we disagree with Jose's suggestion that for a grave risk defense to prevail the incidents of domestic violence must have occurred over an extended period of time and involve vicious circumstances. In support of this position Jose cites numerous cases where courts have found the grave risk defense applied in instances of extreme violence perpetuated on a domestic partner. See *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996); *Simcox v. Simcox*, 511

F.3d 594, 607 (6th Cir. 2007); *Hernandez v. Cardoso*, 844 F.3d 692, 695 (7th Cir. 2016); *Khan*, 680 F.3d at 787; *Habrzyk v. Habryzk*, 775 F.Supp.2d 1054, 1059 (N.D. Ill. 2011); *Van de Sande*, 431 F.3d at 570. While the case law in this area has correctly found a grave risk to the child under these circumstances, we cannot say that a spouse must endure years of violent abuse for this exception to be established. Here, Rocio established by clear and convincing evidence an escalating pattern of verbal and physical abuse, which included restrictions on her movement and employment. This court finds such evidence supports her asserted defense.

¶ 50    In so finding we also reject Jose's argument that Rocio failed to prove the grave risk defense by clear and convincing evidence because she did not present any expert testimony regarding the psychological impact Jose's behavior had on the child. We find that such evidence is not required by Article 13(b). Although such evidence may be helpful in a grave risk defense, it is not necessary. Moreover, Jose provides us with no authority that places such a burden on Rocio and the case law in this area does not require it. Indeed, to require an individual in Rocio's position to obtain, at her expense, medical and psychological experts would undermine the purpose of the grave risk defense. As observed by Judge Posner, "The Hague Convention was created to discourage abductions by parents who either lost, or would lose, a custody contest ***. The Convention drafters adopted a 'remedy of return' *** to discourage abductions, reconnect children with their primary caretakers, and locate each custody contest in the forum where most of the relevant evidence existed. But while the remedy of return works well if the abductor is a non-custodial parent, it is inappropriate when the abductor is a primary caretaker who is seeking to protect herself and the children from the other parent's violence." *Khan*, 680 F.3d at 784. Indeed, because Rocio is the "abductor" (while also being a domestic violence victim), the implementation of the Convention creates an imbalance between Jose and Rocio

from its inception. Specifically, the Convention assists petitioners (Jose) in obtaining and paying for counsel, but not respondents (Rocio). See 22 C.F.R. § 94.6(e) (1989). As Rocio notes, Jose was assigned *pro bono* legal representation from a large family law firm. In contrast, she is paying for her own private counsel. In addition, as Rocio asserts in her brief and as is evident in the record, she does not have the financial means to present expert witnesses on her behalf. For us to require such experts in order for her to meet her burden of clear and convincing evidence would further the imbalance between Jose and Rocio.

¶ 51    In sum, based on the evidence presented in the record we affirm the judgment of the circuit court of Cook County.

¶ 52                                CONCLUSION

¶ 53    For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 54    Affirmed.

**No. 1-19-1762**

| | |
|---|---|
| **Cite as:** | *In re the Parentage of M.V.U.*, 2020 IL App (1st) 191762 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-D-79090; the Honorable Mary S. Trew, Judge, presiding. |
| **Attorneys for Appellant:** | Evan Dylan Whitfield, of Schiller DuCanto & Fleck LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | John Andrew Coladarci and Anne Margaret Coladarci, of Coladarci & Coladarci, of Chicago, for appellee. |